**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AARON C. STEVENSON, et al.,

        Plaintiffs,

  v.

THE CITY AND COUNTY OF SAN
FRANCISCO, et al.,

        Defendants.

_____/

No. C-11-4950 MMC

**ORDER DENYING PLAINTIFFS' MOTION
FOR TERMINATING SANCTIONS, OR,
ALTERNATIVELY, LESSER
SANCTIONS, FOR SPOLIATION OF
EVIDENCE**

Before the Court is the "Motion for Terminating Sanctions, or, in the Alternative,

Lesser Sanctions, Against Defendants for Their Intentional Spoliation of Relevant

Evidence," filed August 7, 2015, on behalf of plaintiffs Aaron C. Stevenson, Kevin D. Taylor,

Kevin W. Smith, Audry Lee and Kirk W. Richardson.  Defendants, City and County of San

Francisco, San Francisco Fire Department, San Francisco Fire Commission, and Civil

Service Commission of San Francisco, have filed opposition, to which plaintiffs have

replied.  The matter came on regularly for hearing September 18, 2015.  Murlene J. Randle

and Robert William Reed of the Law Offices of Murlene J. Randle appeared on behalf of

plaintiffs.  Jonathan C. Rolnick of the San Francisco City Attorney's Office appeared on

behalf of defendants.  Having read and considered the parties' respective written

submissions, and having considered the parties' oral arguments, the Court rules as follows.

//

**BACKGROUND**

In the instant action, plaintiffs, each of whom is African-American and employed or formerly employed by the City and County of San Francisco ("the City") in the Fire Department, challenge the Fire Department's decision not to promote them to the position of H-50 Assistant Chief.  In particular, they challenge as racially discriminatory a promotional examination offered by the City in 2010, the results of which were used by the Chief of the Fire Department to decide who would receive promotions to the position of H-50 Assistant Chief.  By the instant motion, plaintiffs argue they are entitled to sanctions because the City destroyed certain documents, specifically, "scoring keys," also called "worksheets," used by the individuals who rated the examination.

Twenty-three persons took the H-50 examination in 2010, which examination consisted of two exercises.  (See Randle Decl., filed August 7, 2015, Ex. A at 20.)

First, on August 8, 2010, the candidates took the "fire scene simulation exercise" ("FSSE"), which exercise was intended "to measure how well a candidate can coordinate, direct, and give orders to crews under his or her command at a fire emergency."  (See id. Ex. A at 13, 18, 20.)  The candidates were given "four different scenarios," for example, a "high rise scenario" (see id. Ex. A at 18); as to each scenario, the candidates were provided with certain "written and visual information," such as "photos of the fire building," and each scenario was presented to the candidate "via a recorded audio narration."  (See id.)  Each candidate "responded orally to the questions," his/her responses were "recorded via digital recorder" (see id.), and a "verbatim transcription of the candidate's verbal responses to the test questions" was prepared (see id. Ex. A at 24).

Second, on October 30, 2010, the candidates took the "supervision and counseling exercise" ("S/PCE"), which exercise was intended "to measure specific job-related knowledge areas and abilities including monitoring, evaluating, and counseling personnel; ensuring compliance with Department policy; training; information gathering, report writing, and record keeping; and the interpersonal skills of working with others."  (See id. Ex. A at 13, 19-20.)  In the first step of the exercise, a "roleplay," each candidate played the role of

"an Assistant Chief, counseling a Battalion Chief,"[1] which roleplay was "recorded using a video camcorder"; in the second step of the exercise, each candidate "document[ed] the meeting" in writing.  (See id. Ex. A at 19.)

For both exercises, a committee met to "develop the answer (scoring) key" (see id. Ex. A at 20), which meeting occurred "simultaneously with the administration of the respective test exercise to ensure that answers could not be leaked prior to the exam process" (see id. Ex. A at 21).  With respect to the FSSE, each committee member "independently listed the behaviors (anchors) that would appropriately respond to the four test questions," and, then, after discussion among all members, the committee determined "the final product (including point values of the anchors . . .)."  (See id.)  With respect to the S/PCE, the committee members "developed a full set of appropriate responses" to both "the counseling portion" and "the documentation portion" of the exercise, and then "discussed and determined the point value of each item."  (See id. Ex. A at 22.)

The scoring keys developed by the committees were used during the rating process, which process occurred after each exercise had been completed.[2]  The FSSE raters "assessed a verbatim transcription of the candidate's verbal responses to the test questions," and, consequently, had no opportunity to view any of the candidates.  (See id. Ex. A at 24.)  The S/PCE raters "evaluated the counseling session by viewing and listening to the video recording, and evaluated the written documentation of the meeting."  (See id.) The responses were rated by a team of two, each of whom first made an "independent assessment" (see id. Ex. A at 23-24), after which the two raters "would confer and reach [a] consensus on the assigned ratings" (see id. Ex. A at 24).  In that regard, with respect to the FSSE, the raters were instructed (1) to "[i]ndependently review the candidate response while referring to the scoring key to check off the statements that best describe[d] the

---

[1]The "Battalion Chiefs" were "actors trained to perform the role of a battalion chief." (See id. Ex. A at 20.)

[2]The individuals who rated the responses to the FSSE were ten "Fire officers in the rank of Battalion Chief or higher from jurisdictions outside San Francisco" (see id. Ex. A at 23), while four individuals who were "officers" rated the responses to the S/PCE (see id.).

candidate's response" and "[t]otal the score for each dimension and enter this number in the 'Total' box" on the scoring key, and then (2) to use together a form titled Record of Scores, specifically, to place thereon, in addition to the candidate's "credential number" and the raters' "numbers" and signatures, the "point total for each dimension reflecting the independent rating from each rater" and "[t]he consensus score for each dimension." (See id. Ex. 4, Tab 4 at 25.)[3]  Lastly, each candidate's score was calculated by the City's Department of Human Resources ("DHR") based on the numbers set forth on the Record of Scores.  (See Johnson Decl., filed August 28, 2015, ¶¶ 1, 10-11, 14.)

On December 20, 2010, the DHR "posted the H-50 eligible list" and plaintiffs thereafter "filed protests with the Civil Service Commission."  (See id. ¶¶ 15, 17.)  On January 4, 2011, the eligible list was "adopted" and, on January 7, 2011, plaintiffs' protests were denied by the Director of the DHR.  (See id. ¶¶ 19-20.)

Dave Johnson ("Johnson"), a Manager in the DHR who had "coordinated the development and administration of the H-50 Assistant Chief Examination" (see id. ¶¶ 1, 5), "destroyed" the "scoring worksheets" used by the raters (see id. ¶¶ 14, 21).  He did so "sometime during the first week of January 2011 after the adoption of the eligible list and the denial of plaintiffs' protest[s]" (see id. ¶ 21), which destruction he understood was "[c]onsistent with the practice [of the City] at the time" (see id.).  According to Johnson, "once a list is adopted" and the "protest and appeal is over," the "scoring worksheets" can be destroyed, as City employees "no longer have to verify the calculation of candidate scores." (See Randle Decl. Ex. E at 120:25 - 121:6.)

## DISCUSSION

Plaintiffs argue they are entitled to sanctions, in the form of an order striking defendants' answer or an adverse instruction to the jury, in light of the destruction of the worksheets used by the raters.

---

[3]Although the specific instructions provided to the individuals who rated the S/PCE have not been provided to the Court, neither party has suggested the S/PCE instructions pertaining to use of the scoring keys and the Record of Scores differed from the FSSE instructions in any material respect.

1   District courts have discretion to impose terminating sanctions where "a party has

2   engaged deliberately in deceptive practices that undermine the integrity of judicial

3   proceedings." See Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006)

4   (affirming dismissal of complaint, where plaintiff was "on notice that [certain computer] files"

5   were "relevant" to his claims and "intentionally destroyed many [such] files" during

6   pendency of action, causing defendant to be "prejudiced" in its ability to defend against

7   claims).  District courts also have discretion to impose lesser sanctions, such as

8   "permit[ting] a jury to draw an adverse inference from the destruction or spoliation [of

9   evidence] against the party or witness responsible for that behavior." See Glover v. BIC

10  Corp., 6 F.3d 1318, 1329 (9th Cir. 1993).

11  As the parties herein acknowledge, although the Ninth Circuit has not set forth "a

12  precise standard" for determining when sanctions for the destruction of evidence are

13  appropriate, district courts "have widely adopted the Second Circuit's three-part test," which

14  test requires the party seeking sanctions to establish the following:  "(1) that the party

15  having control over the evidence had an obligation to preserve it at the time it was

16  destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that

17  the evidence was relevant to the party's claim or defense such that a reasonable trier of

18  fact could find that it would support that claim or defense." See Apple Inc. v Samsung

19  Electronics Co., Inc., 888 F. Supp. 2d 976, 989-90 (N.D. Cal. 2012).

20  With respect to the first of the above-referenced elements, plaintiffs argue that, at

21  the time Johnson destroyed the scoring worksheets used by the raters, defendants were

22  under an obligation to preserve them.  According to plaintiffs, the obligation arose based on

23  (1) complaints about the H-50 examination submitted by letter to the Civil Service

24  Commission and the DHR, (2) a motion for a temporary restraining order filed by a third

25  party in another action, (3) the DHR's record retention policy and (4) a state statute and a

26  federal regulation requiring employers to retain certain employment records.

27  As discussed below, the Court finds plaintiffs have not offered sufficient evidence to

28  support a finding that, at the time the scoring worksheets were destroyed, defendants had

1   an obligation to preserve them.[4]

2   **A. Complaint Letters Submitted to Civil Service Commission/DHR**

3       After the FSSE concluded, but before the results were posted, each plaintiff

4   submitted a complaint in the form of a letter, and in some instances, two or three letters, to

5   the Civil Service Commission and/or the DHR, identifying asserted problems with the

6   administration of the test.  (See Randle Decl. Ex. K.)  For example, one complaint

7   challenged a scenario in which the narrator twice announced the arrival of "Rescue Squad

8   5" (see id. Ex. K at 2), one contended that certain scenarios required the candidates to

9   perform functions that ordinarily are the responsibility of a Lieutenant or a Captain, but not

10  of an Assistant Chief (see id. Ex. K at 17), and one claimed the "manuals that the

11  candidates were directed to study" had "numerous contradictions" (see id. Ex. K at 55).

12  After the results of the examination had been posted, each plaintiff submitted a complaint in

13  the form of a letter to the Civil Service Commission, in which each plaintiff stated that the

14  "scoring calculation system derived by the exam unit has generated flaws in the scoring of

15  the exam" and that African-Americans in the "applicant pool have placed well behind over

16  50% of their peers highlighting the [in]validity of the examination."  (See id. Ex. K at 9-10,

17  23-24, 35-36, 48-49, 61-62.)[5]

18  *//*

19  _____

20      [4]In light of such finding, the Court does not consider the other elements of the three-part test.

21      [5]Defendants object, on grounds of lack of authentication, to the Court's consideration

22  of the copies of the complaint letters and responses thereto.  With respect to plaintiff
    Taylor's complaint letter dated August 16, 2010, plaintiffs have provided sufficient

23  authentication (see Randle Decl., filed September 4, 2015, Ex. C at 106:10-17), albeit after
    the moving papers had been filed, and, as to said document, the objection is

24  OVERRULED.  Plaintiffs seek to authenticate the remaining complaint letters and
    responses by stating that plaintiffs received them from defendants "in response to the

25  [p]laintiffs' Discovery Request."  (See Randle Decl., filed August 7, 2015, ¶ 13.)  Although
    there is some ambiguity in the law as to whether it is sufficient to simply identify the party

26  from whom a document was received or whether it is necessary to additionally identify the
    discovery request prompting such production, see, e.g., Orr v. Bank of America, NT & SA,

27  285 F.3d 764, 777 & n.20 (9th Cir. 2002), in this instance, given the nature of the
    documents in question and the party from whom they were received, the Court finds a

28  sufficient foundation has been laid, and, accordingly, the objection as to said documents
    likewise is OVERRULED.

1    Plaintiffs argue the above-referenced complaint letters put defendants on notice that

2  plaintiffs would file a lawsuit to challenge the H-50 examination.  Defendants respond that,

3  given the large volume of "protests" the City receives concerning Civil Service

4  examinations, the City does not consider its receipt of such protests to place it on notice of

5  litigation.  (See Rolnick Decl., filed August 28, 2015, Ex. H (deposition of Jennifer Johnston,

6  DHR's Chief of Policy) at 20:8-11, 141:12-21) (testifying she does not consider "protests"

7  challenging examinations as "put[ting] [the City] on notice" of "litigation," as the City

8  receives "hundreds" of such complaints).)

9    The "obligation to preserve evidence arises when the party has notice that the

10  evidence is relevant to litigation — most commonly when suit has already been filed,

11  providing the party responsible for the destruction with express notice, but also on occasion

12  in other circumstances, as for example when a party should have known that the evidence

13  may be relevant to future litigation." Kronisch v. United States, 150 F.3d 112, 126 (2nd Cir.

14  1998).  "Before litigation begins, courts agree that the receipt of a demand letter, a request

15  for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger

16  the duty to preserve evidence." In re Ethicon, Inc. Pelvic Repair Systems Product Liability

17  Litig., 299 F.R.D. 502, 512 (S.D. W.V. 2014) (citing cases).  "[I]t is less clear," however,

18  "what other occurrences should alert a party to preserve evidence for future litigation." Id.;

19  see, e.g., Apple, 888 F. Supp. 2d at 991 (holding duty to preserve evidence "triggered"

20  when "potential claim is identified"); Hynix Semiconductors, Inc. v. Rambus Inc., 591 F.

21  Supp. 2d 1038, 1061 (N.D. Cal. 2006) (finding future litigation reasonably foreseeable when

22  it is "more than a possibility").

23    Neither party has cited to any authority addressing the question of whether

24  complaint letters of the type on which plaintiffs rely are sufficient to give notice that future

25  litigation is likely to ensue.  The Court thus considers whether the subject communications

26  are similar in purpose or effect to the types of communications courts have concluded

27  provide notice of litigation. See, e.g., In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d

28  1060, 1069 (N.D. Cal. 2006) (holding duty to preserve evidence arose when plaintiff's CEO

1   advised defendant that if it did not take certain action, defendant "would be sued").

2          Unlike demand letters, threats of litigation, or other communications in which a party

3   states an intent to pursue legal action, the subject complaint letters do not implicitly or

4   expressly threaten litigation.  Rather, as plaintiffs acknowledged at the hearing on the

5   instant motion, the purpose of such letters is to request that the City not use the results of

6   an examination that has been given and, instead, to offer a new examination.

7   Communications that identify a dispute but seek a resolution thereof by means other than

8   by litigation have been held insufficient to reasonably place the receiver on notice of future

9   litigation.  See, e.g., Cache La Poudre Feed, LLC v. Land O'Lakes, Inc., 244 F.R.D. 614,

10  622 (D. Colo. 2014) (finding defendant not on notice when it received letter from counsel for

11  trademark holder, where letter, although identifying "client's trademark rights," did not

12  "threaten [ ] impending litigation" and stated client was "willing to explore a negotiated

13  resolution"; citing cases finding communications seeking to resolve identified dispute by

14  means other than litigation not sufficient to place receiver reasonably on notice of litigation).

15         Moreover, denials of complaints submitted to the Civil Service Commission are

16  "final" and not further reviewable.  See San Francisco Civil Service Commission Rules,

17  Rule 311.4 (providing, with respect to challenges to examination, "decision of the Civil

18  Service Commission is final and not subject to reconsideration").  Consequently, plaintiffs'

19  complaint letters are unlike administrative claims that must be submitted as a condition of

20  bringing a lawsuit, which administrative claims courts have found give rise to a duty to

21  preserve evidence upon notice thereof.  See, e.g., Tabon v. University of Pennsylvania

22  Health System, 2012 WL 2953216, at *2 (E.D. Pa. July 20, 2012) (holding, with respect to

23  employment discrimination claim, "duty to preserve arises when the defendant receives

24  notice of an EEOC charge"); Powell v. Town of Sharpsburg, 591 F. Supp. 2d 814, 819

25  (E.D. N.C. 2008) (finding defendant's duty to preserve evidence relevant to employment

26  discrimination charge arose when it received notice of plaintiff's "EEOC charge of

27  //

28

8

1    discrimination"; citing cases).[6]

2         Lastly, the Court has considered plaintiffs' argument that emails exchanged between

3    various City employees, acknowledging receipt of the complaint letters, support a finding

4    that defendants did, in fact, treat those letters as evidencing a likelihood of litigation.

5    Although the emails plainly evidence defendants' knowledge that plaintiffs had complained

6    about the H-50 examination (see, e.g., Randle Decl. Ex P (email from Johnson to his

7    superior) CCSF-AS 019572 (referencing "draft responses" to complaint letters)), nothing in

8    those exchanges in any manner suggests that any of those employees either anticipated or

9    should have anticipated any future litigation.

10        Accordingly, the Court finds the complaint letters were insufficient to place

11   defendants on notice that future litigation was likely to ensue.

12   **B. Motion for Temporary Restraining Order Filed in Johnson Case**

13        In 2009, a third party to the instant action, Mark Johnson, filed in district court an

14   action challenging the results of a different civil service examination given by the City,

15   specifically, a 2008 examination for the H-40 Battalion Chief position.  See Johnson v. City

16   and County of San Francisco, Civil Case No. 09-5503 JSW.  On July 23, 2010, the plaintiff

17   therein filed an application for a temporary restraining order ("TRO"), seeking to postpone

18   the date on which the City had announced it would give the H-50 Assistant Chief

19   Examination, which application was denied by order filed August 5, 2010.  Plaintiffs herein

20   argue the application for a TRO put defendants on notice that the results of the H-50

21   Assistant Chief Examination would be challenged in court.

22        As set forth in the district court's order denying the application for a TRO, see

23   Johnson v. City and County of San Francisco, 2010 WL 3078635, at *1 (N.D. Cal. August

24   5, 2010), and acknowledged at the hearing on the instant motion, the plaintiff in Johnson

25

26 ─────────────────────

27        [6]Each plaintiff herein did submit an administrative charge to the Equal Employment
     Opportunity Commission and/or the Department of Fair Employment and Housing, but the
     City received notice of the earliest of those charges on January 14, 2011 (see Bushong
28   Decl., filed August 28, 2015, ¶ 4), a date after the subject scoring worksheets had been
     destroyed.

1   sought to postpone the H-50 Assistant Chief Examination not because he had any

2   complaint about the content of the H-50 Assistant Chief Examination but, rather, because,

3   as a result of his not having been promoted to the H-40 Battalion Chief position, he was not

4   qualified to take the examination for the H-50 Assistant Chief position.  Indeed, at the time

5   his application for a TRO was filed and denied, the H-50 examination had not been given

6   and the content thereof was unknown by the candidates and potential candidates.

7       Accordingly, given the above-described circumstances, the Court finds the

8   application for a TRO filed in <u>Johnson</u> was insufficient to put defendants on notice that

9   candidates who later took the H-50 examination would file a lawsuit challenging the

10  examination.

11  **C.  City's Retention Policy**

12      Plaintiffs argue that the City was obligated to preserve the scoring worksheets used

13  by the raters, irrespective of any notice of litigation, in light of the DHR's record retention

14  policy.  The policy, titled "Department of Human Resources Record Retention and

15  Destruction Policy," was "adopted pursuant to Chapter 8 of the San Francisco

16  Administrative Code, which requires each department to develop policies to properly

17  maintain records and to create a systematic records retention and destruction schedule."

18  (<u>See</u> Randle Decl. Ex. C, Ex 2 thereto.)

19      The San Francisco Administrative Code defines "record" to mean "such paper, book,

20  photograph, film, sound recording, map, drawing or other document, or any copy thereof,

21  as has been made or received by the department in connection with the transaction of

22  public business and may have been retained by the department as evidence of the

23  department's activities, for the information contained therein, or to protect the legal or

24  financial rights of the City and County or of persons directly affected by the activities of the

25  City and County," <u>see</u> San Francisco Administrative Code § 8.1; such definition is

26  contained in the DHR's written policy (<u>see</u> Randle Decl. Ex. C, Ex. 2 thereto at 1.)

27      The issue before the Court is whether the scoring worksheets used by the raters

28  constitute "records" within the meaning of the Administrative Code and, by extension, the

1  DHR's policy.[7]

2      "Courts interpret municipal ordinances in the same manner and pursuant to the

3  same rules applicable to the interpretation of statutes."  City of Monterey v. Carrrnshimba,

4  215 Cal. App. 4th 1068, 1087 (2013).  "Although statutory interpretation is ultimately a

5  judicial function, the contemporaneous construction of a statute by an administrative

6  agency charged with its administration and interpretation, while not necessarily controlling,

7  is entitled to great weight and should be respected by the courts unless it is clearly

8  erroneous or unauthorized."  Id. (internal quotation and citation omitted).

9      In the instant case, Johnson testified at his deposition, as well as stated in a

10  declaration submitted in opposition to the instant motion, that he destroyed the used

11  scoring worksheets in conformity with DHR policy, specifically, the policy that, after an

12  eligibility list is adopted and any protests have been denied, the used scoring worksheets

13  are to be destroyed.  (See Randle Decl. Ex. C at 120:20 - 121:6; Johnson Decl. ¶ 21.)  As

14  explained by Johnson, the Record of Scores is the "official record of a candidate's

15  performance on [an] exam," and is retained by the DHR, whereas the "scoring worksheets"

16  are considered "non-records" as "they are superseded by the Records of Scores and are

17  not necessary to the functioning or continuity of DHR operations."  (See Johnson Decl.

18  ¶ 14.)

19      Plaintiffs argue that Johnson's supervisor, John Kraus ("Kraus"),[8] has testified,

20  during two different depositions, that the scoring worksheets used by the raters are

21  documents that should be retained as "records" under DHR's policy, and, consequently,

22  that the Court should defer to Kraus's, rather than Johnson's, understanding of the policy.

23  _____

24      [7]The policy's sole reference to materials used in connection with Civil Service
   examinations is found in a section titled "Categories of Records," in which the policy gives,
25  as an example of "records" that may be preserved in an off-site location, "examination
   materials that are older than one year but less than five years and no longer necessary for
26  regular or immediate access."  (See id. Ex. C, Ex. 2 thereto at 2.)  The term "examination
   materials," however, is not defined.

27      [8]Kraus testified that his "functional title" is "director of recruitment and assessment
   services" and his "official classification" is "assistant deputy director."  (See Randle Decl.
28  Ex. C at 7:21-25.)

1    As set forth below, however, the Court finds Kraus's deposition testimony does not support

2    a finding that Kraus's interpretation differs from that of Johnson.

3        During his first deposition, Kraus testified that the form the raters use to memorialize

4    their "consensus" is the "official rating" that would be retained, i.e., the Record of Scores,

5    whereas "anything prior to that," specifically, "their note rating form, the one they took

6    initially," would not be retained.  (See Randle Decl. Ex. D at 36:6 - 39:18.)[9]  The testimony

7    on which plaintiffs rely was given during Kraus's second deposition, at which he was shown

8    a blank version of the scoring key and asked whether it was a document that needed to be

9    retained under the DHR's retention policy, to which he responded "there should be a copy

10   of the scoring guidelines . . .  somewhere."  (See id. Ex. C at 61:2-8, 62:3-23.)[10]  Given the

11   particular exhibit shown the witness, i.e., a blank form, the testimony is, at best,

12   ambiguous.  Moreover, any ambiguity was thereafter clarified when the witness was asked

13   "should the form that was completed by the rater be somewhere," to which the witness

14   responded, "what I expect to see is their consensus rating" (see id. Ex. C at 62:24 - 63:22),

15   and further clarified when read in the context of testimony he gave earlier in the same

16   deposition, in which he explained that the "official record" is the "document" that "reflect[s]

17   the individual ratings of the two raters and the consensus score of the two raters," i.e., the

18   Record of Scores (see id. Ex. C at 58:21 - 59:24.)

19       In sum, Kraus's testimony as to the DHR's interpretation of "records" is wholly

20   consistent with Johnson's understanding that the scoring worksheets used by the raters are

21   not "records," and plaintiffs have not shown any other employee has either interpreted or

22   applied the DRH's policy differently.  Under such circumstances, the Court finds it

23   appropriate to defer to the DHR's interpretation of "records."

24   //

25

26       [9]From the context in which it appears, the term "note rating form" is a reference to
     the scoring key here at issue.  (See id. Ex. D at 35:0-25 (describing "scoring key" as "a
27   rating form").)

28       [10]Indeed, defendants did retain that scoring key form, a copy of which was produced
     during discovery and, as set forth above, shown to the witness.

1   Accordingly, the Court finds the "Department of Human Resources Record Retention

2   and Destruction Policy" did not obligate defendants to retain the scoring worksheets used

3   by the raters.

4   **D.  State and Federal Statutory Duties**

5   Pursuant to California state law, "[i]t shall be an unlawful practice for employers . . .

6   to fail to maintain and preserve any and all applications, personnel, membership, or

7   employment referral records and files for a minimum period of two years."  See Cal. Gov't

8   Code § 12946.  Additionally, a federal regulation requires that "[a]ny personnel or

9   employment record made or kept by a political subdivision . . . shall be preserved . . .  for a

10  period of 2 years."  See 29 C.F.R. § 1602.31.  Plaintiffs argue that the above-quoted statute

11  and regulation obligated the City to retain the scoring worksheets used by the raters of the

12  H-50 examination.  Plaintiff's argument is not persuasive.

13  With respect to the state statute, plaintiffs rely on Irion v. County of Contra Costa,

14  2005 U.S. Dist. LEXIS 4293 (N.D. Cal. March 16, 2005), which appears to be the sole

15  decision in which a court has considered the question of what types of documents fall

16  within the scope of § 12946.  In that case, the district court found an employer had violated

17  § 12946 by destroying "score sheets" on which the raters who had interviewed candidates

18  for a position had given each candidate a score, where those scores were then used by the

19  employer to determine which candidate would be hired.  See id. at *37-38.  Here, however,

20  unlike the situation in Irion, the City did retain the document on which the raters recorded

21  the scores that were used to determine where each applicant would be placed on the

22  eligibility list, namely, the Record of Scores.

23  With respect to the federal regulation, the Seventh Circuit, the only court to have

24  considered an issue in any manner analogous to that presented in the instant case,

25  concluded that "ranking sheets, manager's notes and evaluations notes" made by raters,

26  who met to determine a ranking to be given to each employee for purposes of effectuating

27  a reduction-in-force, did not constitute "employment records" under § 1602.31.  See

28  Rummery v. Illinois Bell Telephone, 250 F.3d 553, 558-59 (7th Cir. 2001).  Rather, the

13

1  Seventh Circuit found that the document that had been retained by the employer,

2  specifically, "one summary sheet averaging out the ratings for each individual," was the

3  "actual employment record" the employer was required to retain under § 1602.31.  See id.

4  As the Seventh Circuit put it, "[it] is sufficient that the employer retains only the actual

5  employment record, not the rough drafts or processes which may lead up to it."  See id. at

6  559.  Here, as discussed above, the City did retain the Record of Scores, the document on

7  which the individual scores of each rater, as well as the consensus score of both raters, are

8  formally recorded, and which document was used to determine the candidate's placement

9  on the eligibility list.

10         Accordingly, the Court finds neither § 12946 nor § 1602.31 obligated defendants to

11  retain the scoring worksheets used by the raters.

**CONCLUSION**

13         For the reasons stated above, plaintiffs' motion for sanctions is hereby DENIED.

14  **IT IS SO ORDERED.**

16  Dated:  October 21, 2015

MAXINE M. CHESNEY
United States District Judge

14